**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHAUNCEY MAHAN

      Plaintiff,

   vs.

ROC NATION, LLC,
ROC-A-FELLA RECORDS, LLC,
SHAWN CARTER p/k/a "JAY Z"

     Defendants.

Case No. 14-cv-5075 (LGS)

JUDGE SCHOFIELD

<u>ECF CASE</u>

**PLAINTIFF CHAUNCEY MAHAN'S MEMORANDUM OF LAW IN
OPPOSITION TO ROC NATION'S MOTION TO DISMISS
COUNTS IV-V UNDER RULE 12(b)(6)**

# **[INSERT]**

## **TOC - TOA**

**PRELIMINARY STATEMENT**

Plaintiff Chauncey Mahan ("Mahan") is a Grammy Award-certified record producer and sound engineer.  [FAC, R. 31, ¶¶ 12-20].  He is the original creator and initial co-owner of 41 individual hip-hop songs (the "41 Song Titles") which were selected by defendant Roc-A-Fella, LLC, a record label, to be published as a part of three separate compilation works (the "3 Album Titles"). [Id. at ¶ 101-114] The 41 Song Titles feature the performances of co-defendant Jay Z, a rapper, as well as other producers ("beatmakers") and vocalists.

On or about April 14-18, 2014, Jay Z, acting in concert with his limited liability company, Roc Nation, LLC, and with the knowing assistance of record label Roc-A-Fella, LLC, initiated "sham" criminal proceedings against Mahan with the malicious intent to convert his valuable property.  [Id. at ¶ 210-224]

On July 3, 2014, Mahan promptly filed suit to quiet title to his property. [Compl., R. 1].  Defendant Roc Nation moves to dismiss Counts IV-V of the First Amended Complaint ("FAC") [R. 31] for failure to state a claim. [R. 36]  For the reasons set forth below, Defendants' motion should be denied in its entirety. Mahan also respectfully seeks leave of Court under Fed. R. Civ. P. 15(a)(2) to amend his complaint to cure any pleading deficiencies.

**STANDARD OF LAW**

When deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Kassner v. 2nd

Ave. Delicatessen, Inc., 496 F. 3d 229, 237 (2d Cir. 2007). A plaintiff's factual allegations "must be enough to raise a right of relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted). Plaintiff's claims survive if he "nudge[s] [his] claims across the line from conceivable to plausible." Id. at 570; see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009).

## ARGUMENT

### POINT I

### MAHAN IS AN ORIGINAL CO-AUTHOR AND INITIAL CO-OWNER OF THE SR COPYRIGHTS

A.   MAHAN IS VESTED WITH CONSTITUTIONAL RIGHTS OF ORIGINAL AUTHORSHIP

An author "in a constitutional sense" is one "'to whom anything owes its origin; originator; maker.'" Feist Publ., Inc. v. Rural Tel. Svc. Co., Inc., 499 U.S. 340, 346 (1991), quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884). The creator of a work is, at least presumptively, its author. See, e.g., Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989); Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 107 (2d Cir. 2002); see also WEBSTER'S THIRD INTERNATIONAL DICTIONARY 146 (2002) (defining "author" as a person "who is the source of some form of intellectual or creative work.").

"Originality is a constitutional requirement" which consists of "independent creation plus a modicum of creativity." Feist Publ., citing The Trademark Cases, 100 U.S. 82, 94 (1879); see also PATRY ON COPYRIGHT, § 5:36, p. 5-87 (Rel. 10, 9/2012).

("to be an author, one must, as a constitutional requirement, independently create a certain amount of original material.").

Under the Copyright Act of 1976, protection subsists in "original works of authorship," which includes "sound recordings." 17 U.S.C. § 102(a)(7). "Copyright protection extends to two distinct aspects of music: (1) the musical composition, which is itself usually composed of two distinct aspects--music and lyrics; and (2) the physical embodiment of a particular performance of the musical composition, usually in the form of a master recording." Staggers v. Real Authentic Sound, 77 F. Supp. 2d 57, 61 (D.D.C. 1999); see also 6 NIMMER ON COPYRIGHT, § 30.03 (2003) ("Copyright ownership of the physical embodiment of the performance of a musical composition [consisting of] any creative, original, or expressive contribution to the song recordings at issue (e.g., a master recording) is distinct from the ownership of the copyright in the musical composition itself.").[1]

The rights of authorship in a sound recording vest at the time it is fixed in a tangible form of expression. 17 U.S.C. § 101. "[T]he sound recording copyright does not attach to the underlying work per se, but only to the aural version of such work as fixed on the material object." 1 NIMMER ON COPYRIGHT § 2.10[A][2] (1987). The requirement of fixation in a "tangible medium of expression" is met when the sound is embodied in a magnetic tape or a diskette. Innovative Concepts in Entertainment, Inc. v. Entertainment Enterprises Ltd., 576 F.Supp. 457 (E.D.N.Y.

---

[1] Significantly, Mahan does not claim that he *composed* the recordings so as to entitle him to publishing rights (the "PA Copyright"). Rather, Mahan claims that he is the party who actually *created* each sound recording (the "SR Copyright"). This distinction is critical.

1983) (a computer chip may constitute a sound recording if sounds are fixed therein)

When copyright protection was first extended to sound recordings in 1971, and again when Congress enacted the Copyright Act of 1976, 17 U.S.C. § 101, et seq., the legislature specifically contemplated that, along with the musicians and vocalists, the sound engineers and producers of sound recordings would be considered an author of the work.  See H.R. Rep. No. 94-1476, at 56 (1976).

The authorship elements identified by Congress expressly include the contributions that are normally associated with the sound engineer, who is responsible for "capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording." See H.R. REP. NO. 1476, 94th Cong. 2d Sess. 56 (1976); see also Forward v. Thorogood, 985 F.2d 604, (1st Cir. 1993) ("It is apparent from this passage that the 'producer' envisaged by the [House] committee is one who engages in artistically supervising and editing the production.").  Since passing the Copyright Act, federal courts have uniformly held that a sound engineer is a legally cognizable co-author of a sound recording.[2]

---

[2] See, e.g., Diamond v. Gillis, 2005 U.S. Dist. LEXIS 2410 (E.D. Mich. Feb. 17, 2005) ("work as an engineer, co-producer, and mixer is within the ambit of authorship for purposes of a copyright in sound recording"); Ulloa v. Universal Music and Video Distribution Corp., 303 F.Supp.2d 409, 418 (S.D.N.Y. 2004) ("an original contribution by a sound engineer, editor, or producer may result in a joint ownership between the record producer and a performing artist in a sound recording.") citing 1 NIMMER ON COPYRIGHT § 2.10[A][3]; JCW Investments, Inc. v. Novelty Inc., 289 F. Supp. 2d 1032 (N.D. Ill. 2003) (a sound engineer may be deemed an author when he is "responsible for setting up the session, capturing and electronically processing the sounds, and compiling and editing them to make a final sound recording.'") (citation omitted); Staggers v. Real Authentic Sound, 77 F.Supp.2d 57, 63 (D.D.C. 1999) (where a sound engineer's creative contributions to the sound recording are substantial, a joint authorship may exist); Systems XIX, Inc. v. Parker, 30 F. Supp.2d 1225, 1228-30 (N.D. Cal. 1998) (finding joint ownership where plaintiff undertook the arrangement and administration of recording equipment, electronic processing of sounds, and balancing or equalization of vocal and instrumental components into a "blended whole,"); quoting U.S.

Here, Mahan readily sustains his burden to prove authorship of the 41 Song Titles.  First, Mahan actually created the works. [FAC, R. 31, ¶¶ 153-180] There can be no dispute that Mahan recorded the sound recordings in question by fixing audio waves into a tangible form of expression..  See Cmty. For Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) ("As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."). Second, Mahan's contributions were original.  [FAC, R. 31, ¶¶ 153-195].  For purposes of establishing original expression, a recording engineer is to sound recordings what a photographer is to photographic images.[3] Thus, Mahan's selection of a professional recording studio and the procurement of high fidelity equipment, coupled with the recording process itself, logically meets the standard of original expression required for copyright protection.  Third, Mahan's contributions were substantial in amount or "non-trivial."[4]  [Id.]  Indeed, he was the dominant contributor of each recording.

---

COPYRIGHT OFFICE, Compendium of Copyright Office Practices § 495.01 at 400-37.

[3]  In photography, original expression can be found in the mere process of staging a scene or capturing a pre-existing image. See, e.g., Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992) ("Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved."); Mannion v. Coors Brewing Co., 377 F.Supp.2d 444, 452 (S.D.N.Y. 2005) (recognizing that in many cases, the photographer does not invent the scene or create the subject matter depicted in it. Rather, the original expression she contributes lies in the rendition of the subject matter).

[4] For two or more people to become co-authors, each author must contribute some non-trivial amount of creative, original, or intellectual expression to the work and both must intend that their contributions be combined. 1 Nimmer on Copyright § 6.07; see Gaiman v. McFarlane, 360 F.3d 644, 658-59 (7th Cir. 2004). The components must also be "inseparable or interdependent" parts of a whole but each co-author's contribution need not be equal for them to have an equal stake in the work as a whole. 17 U.S.C. § 101; 1 Nimmer on Copyright § 6.03.

**B.** **MAHAN POSSESSES INITIAL CO-OWNERSHIP RIGHTS IN THE 41 SONG TITLES**

Once authorship rights have been vested, the sound recording becomes "the property of the author who created it." U.S. COPYRIGHT OFFICE, Circular No. 9; 17 U.S.C. § 201(a) (providing that legal ownership in a copyright "vests initially in the author or authors of the work."); see also Brownstein v. Lindsay, 742 F.3d 55, 68-69 (3rd Cir. 2014) ("the ownership interest vests from the act of creating the work, rather than from any sort of agreement between the authors or any act of registration with the Copyright Office.").[5]

## POINT II

## ROC NATION IS A PLAUSIBLE CO-OWNER OF THE SR COPYRIGHTS

**A.** **REGISTRATION FORMS DO NOT ESTABLISH THE IDENTITY OF VALID OWNERS**

"Ownership of the copyright is . . . always a threshold question." See Topolos v. Caldewey, 698 F.2d 991, 994 (9th Cir. 1983). The "Court is required to determine independently whether plaintiff owns valid copyrights in the works at issue." Ward v. National Geographic Soc., 208 F. Supp.2d 429, 448 (S.D.N.Y. 2002) The truth as to whether Roc Nation is a valid co-owner of the SR Copyrights is a fact-based matter best resolved through the adversarial process. See Mackey v. Montrym, 443 U.S. 1, 13 (1979) ("[O]ur legal tradition regards the adversary process

---

[5] Significantly, sound recordings and musical compositions are separate works with distinct copyrights, requiring two separate registrations. 17 U.S.C. § 102(a)(2), (7); Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1026 (3d Cir. 2008) ("[C]opyrights in sound recordings, . . . are separate and distinct from the copyrights in musical compositions. . . . "); 6 NIMMER ON COPYRIGHT § 30.03 (same). The case at bar only involves the assertion of sounding recording ("SR") Copyrights; not musical composition ("PA") Copyrights.

as the best means of ascertaining truth and minimizing the risk of error . . .).

Here, Defendants operate under the delusion that copyright registration forms, standing alone, are dispositive of the substantive rights of ownership.  This argument is devoid of merit.[6]  "Copyright registration does not establish the copyright, which attaches at the moment of creation."  2 NIMMER ON COPYRIGHT, § 7.16.  Rather, the registered form accords the denominated title holder a rebuttable presumption that the facts stated on the face of the filed application are true.  See NIMMER ON COPYRIGHT, § 12.05[C][3], p. 12-150.21 (2012) ("Though a certificate conveys a *prima facie* presumption of ownership, the presumption is rebuttable.").[7] Brownstein, 742 F.3d at 68-69 ("Validity of a copyright denotes ownership . . . Registration of a copyright, on the other hand, is merely '*prima facie* evidence of the validity of the copyright . . . .'"); 17 U.S.C. §§ 401(c)-(d).  As such, Mahan is entitled to disprove the validity of Roc-a-Fella's purported ownership through discovery of relevant and admissible evidence.[8]

## B.    ROC NATION'S RIGHTS ARE WHOLLY CONTINGENT ON WRITTEN CONTRACTS

---

[6] See Brownstein, 742 F.3d at 68 at fn. 16  ("Pivotal to this case is distinguishing an author's interest in the copyright to his work from the registration of his work. A "copyright", as a right, vests immediately upon the creation of the work. 17 U.S.C. § 201(a).  For this reason, a copyright must not be confused with the act of registering that right.").

[7] Moreover, registration is not even required to vest ownership in the original author of the work. Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237 (2010) (holding that a federal court has subject matter jurisdiction to adjudicate claims involving unregistered works); 17 U.S.C. § 408(a) (providing that registration is permissive for any work created on or after the effective date of the current Copyright Act – January 1, 1978).  Accordingly, an original author's failure to register the copyright in such a work does not cause it to lose copyright protection or fall in the public domain.

[8] Defendants do not dispute this.  See Roc-A-Fella's Opening Br., R. 38 at 21, fn. 8 ("a copyright registration creates a presumption that the copyright is valid.").

"[W]hile many individuals may contribute to the final product, the Act does no more than give publishers and producers 'statutory permission' to contract with the various contributors for the rights of authorship." Effects Assoc., Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990) (internal citation omitted).  The Copyright Act permits an artificial entity, such as Roc-A-Fella or Roc Nation, to acquire a copyright interest in a sound recording work through one of either two ways: (1) a legal employment relationship where ALL of the original authors are common law employees of the entity before the date of creation, 17 U.S.C. §§ 201(b);[9] or (2) a written contract containing a transfer of ownership or assignment provision. 17 U.S.C. §§ 204(a)[10]

Here, Roc Nation attempts to escape on grounds that it was not formed as an entity until 2008. [R. 36 at 9].  However, as explained in the preceding paragraph, any ownership rights Roc Nation holds are subject to determination based on a diligent review of written instruments containing a copyright assignment provision which transfers ownership to Roc Nation.[11]

---

[9]  However, "where a non-employee contributes to a [work] . . . the exclusive rights of copyright ownership vest in the creator of the contribution, unless there is a written agreement to the contrary." Community for Creative Non-Violence, 109 S.Ct. at 2172-73

[10]  Aside from "operation of law" (e.g., bankruptcy or inheritance), there are no other statutory means available for an artificial entity to acquire a voluntary transfer of copyright ownership interests.  Transfer by way of statute of limitations, in Mahan's view, is involuntary.

[11]  Here, Roc-A-Fella was an organized entity as of the time of creation.  However, Mahan was not Roc-A-Fella's employee; but was instead an independent contractor.  As a result, Roc-A-Fella cannot legally claim authorship nor initial ownership of any one of the 41 Song Titles (nor Mahan's Pre-Existing Duplates).  Thus, as  a matter of law, any ownership rights Roc-A-Fella holds to the 41 Song Titles can only be determined by review of written contracts containing a copyright assignment provision, duly executed by one of Mahan's co-authors, which transfer a co-ownership interest to Roc Nation, LLC.  Any such writing would require identification of the 41 Song Titles, as well as any of their pre-existing versions, such as Mahan's Pre-Existing Dubplates..

C.     IT IS PLAUSIBLE THAT ROC NATION IS A BENEFICIAL CO-OWNER OF THE
       SR COPYRIGHT HOLDINGS AT ISSUE

A beneficial owner is an individual or entity who has a substantial interest in

the exploitation of an exclusive right in a copyrighted work.  See 3 GOLDSTEIN,

COPYRIGHT, § 15.5.1.2 (3d ed. & 2011 Supp.) (citing H.R. Rep. No. 94-1476, at 159

(1976)).  The author of a work retains a beneficial interest where legal title to the

copyright is transferred in exchange for a percentage of royalties based on sales or

license fees derived from exploitation of the copyright.  See, e.g., Cortner v. Israel,

732 F.2d 267, 270-71 (2d Cir. 1984) (stating that a right to royalties for exploitation of

copyrighted music gives rise to a beneficial interest); Moran v. London Records,

Ltd., 827 F.2d 180, 182-83 (7th Cir. 1987) (describing a beneficial owner as a person

who has parted with legal title in exchange for royalties).

Here, Roc Nation's pre-litigation conduct is sufficient to nudge the line from

conceivable to plausible that Roc Nation is a beneficial owner of the SR Copyrights.

For example, it is common for individual recording artists to use "loan-out"

companies" or other artificial entities to warehouse their copyright holdings.  Given

that Jay Z is a reported principal or controlling member of Roc Nation, LLC, it is

entirely plausible that Roc Nation holds whatever copyrights Jay Z owns. [12]

---

[12] If Roc Nation does not have any copyright assignments in its custody, possession and control relating to the SR Copyrights at issue, then a record of that fact will be made in this proceeding. And if Roc Nation fails to disclose, that fact can be used against them in a subsequent proceeding. However, to dismiss Roc Nation from the declaratory judgment action at this early juncture based on its "word" is unlikely to bring final or expedient resolution to the dispute.  Given Roc Nation's pre-litigation assertion of rights in the extrajudicial context, Mahan respectfully requests that the Court defer adjudication of Roc Nation's ownership interests until such time as the parties have had an opportunity to complete the first round of document discovery.

## POINT III

## UNDER FED R. CIV. P. 19, JOINDER OF ROC NATION IS COMPULSORY OR, IN THE ALTERNATIVE, PERMISSIVE UNDER FED. R. CIV. P. 20

Under Fed. R. Civ. P. 19, Roc Nation must be joined as a party because: (1) the court cannot accord complete relief among existing parties in that person's absence, or (2) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may (a) as a practical matter impair or impede the person's ability to protect the interest; or (b) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Permissive joinder of defendants is governed by Rule 20(a) of the Federal Rules of Civil Procedure, which provides that defendants may be joined as parties if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action.[16]

This standard is interpreted broadly because "[u]nder the Rules, the impulse is toward entertaining the broadest possible scope of action." United Mine Workers of America v. Gibbs, 383 U.S. 715, 724 (1966); T Digital Sin, Inc. v. Does 1-176, 279 F.R.D. 239, 244 (S.D.N.Y. 2012) (finding joinder proper in copyright infringement action and allowed plaintiffs to go forward with early discovery).  As to Rule 20(a)(2)(B), "common questions of law or fact" is satisfied where plaintiffs allege the same claim against each defendant. Third Degree II, 2012 WL 2522151 (E.D.

Mich. May 29, 2012).

Here, in proceedings before the Court, Roc Nation represented to the Court that "it does not claim, and has never claimed, to be the owner of the copyrights in dispute" (Letter to the Hon. Lorna G. Schofield from Cynthia S. Arato, Sept. 12, 2014 [R. 24 at 2] ("Sept. 12 Ltr.").  Roc Nation's representations to the Court constituted a complete 180-degree shift from Roc-Nation's pre-litigation communications to the NYPD, LAPD, Mahan and lead counsel for Mahan.[13]

Based on Roc Nation's representations to the Court, Mahan prepared a written Settlement Agreement which asked Roc Nation to execute a binding written contract embodying these identical representations.[14]  However, Roc Nation abjectly refused to deal; indeed, it did not even bother to respond with a redlined mark-up.   Instead, Roc Nation elected to charge forward with litigation, deliberately increasing the costs of this proceeding and taxing the resources of all parties and the Court.   The only logical conclusion to be drawn from Roc Nation's abject refusal to sign a Settlement Agreement is that Roc Nation is deliberately misleading the Court with respect to its true ownership status. [15]

---

[13] Although Roc Nation's "flip-flop" serves as probative evidence that its pre-litigation petitioning activity was instigated in bad faith; Mahan was prepared in good faith to resolve the dispute so as to comply with the Court's initial directives.

[14] Mahan's insistence on a written agreement were two-fold: (1) Section 204(a) of the Copyright Act, which is the "statute of frauds" provision, requires a copyright assignment to be in writing, 17 U.S.C. § 204(a); (2) Roc Nation's 180 degree "flip-flop" before the Court revealed that Roc Nation was capable of shape-shifting its position by doing nothing more than terminating its former litigation team and hiring new counsel.

[15] This creates the legitimate concern that if Roc Nation is dismissed from the action before the Court's determination as to the respective parties' ownership rights (i.e., before document discovery is complete) that there will be nothing to prevent Roc Nation from flipping right back to its former position and launching a collateral attack against Mahan in a subsequent proceeding.  And if Mahan

## POINT IV

### ROC NATION, ROC-A-FELLA, AND JAY Z
### ARE JOINT TORTFEASORS

Based on Mahan's factual allegations in support of Count V, the three Defendants should be held jointly and severally liable for actively participating in, assisting, ratifying or encouraging tortious conduct.  See, e.g., Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986); Fendi Adele S.R.L. v. Filene's Basement, Inc., 696 F.Supp.2d 368, 385 (S.D.N.Y. 2010) (finding that with respect to tortious acts, every entity "actively partaking in, lending aid to, or ratifying and adopting such acts is liable" as a joint tortfeasor); Microsoft Corp. v. AGA Solutions, Inc., 589 F.Supp.2d 195, 197 (E.D.N.Y. 2008) (finding that defendants that "personally participated in and/or had the right and ability to supervise, direct and control the infringing conduct" are liable as joint tortfeasors).

Once the specific roles of each Defendant have been determined through factual discovery, there are multiple cognizable theories under which joint tortfeasor liability may attach, including "aiding and abetting," "concerted action," "integrated enterprise," or "conspiracy."  See In re Terrorist Attacks on Sept. 11, 2001, 392 F. Supp. 2d 539, 554 (S.D.N.Y. 2005) ("Conspiracy and aiding and abetting are varieties of concerted-action liability: conspiracy requires an agreement to commit a tortious act, . . . aiding and abetting requires that the defendant have given substantial assistance or encouragement to the primary wrongdoer. . . . In

---

were to raise Roc Nation's representations to this Court, a high probability exists that Roc Nation's next counsel will be sure to discount these representations in the very same manner that Roc Nation now discounts the communications made by Reed Smith, LLP, its former counsel.

order to be liable for acting in concert with the primary tortfeasor under either theory, the defendant must know the wrongful nature of the primary actor's conduct.").[16]  it is too early to determine which theory

Here, Mahan alleges that Roc Nation's former counsel, Reed Smith LLP, initiated "sham" criminal charges against Mahan.  [FAC, R. 31 at 52, ¶ 210].  It is also alleged that Jay Z is the founder of both Roc Nation and Roc-A-Fella [Id. at ¶ 22, 30] and a principal member of Roc Nation [Id. at ¶ 73].  Mahan contends that a reasonable inference may be drawn that Jay Z is the primary tortfeasor and that Roc Nation was employed as an instrumentality to provide substantial assistance in aiding the wrongful conduct.

It is also plausible at this juncture that Roc-A-Fella gave substantial assistance and encouragement to Jay Z as it is Roc-A-Fella who now asserts ownership interests in both the Chattel and SR Copyrights.[17]

---

[16] See also In re Sumitomo Copper Litigation, 120 F. Supp. 2d 328 (S.D.N.Y. 2000); EZ–Tixz, Inc. v. Hit–Tix, Inc., 1995 WL 77589, at *6 (S.D.N.Y. Feb. 27, 1995) (joint tortfeasor liability requires defendant to "specifically direct, approve or otherwise engage" in infringing acts); RESTATEMENT (SECOND) OF TORTS § 876(b) cmt. (1979) ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.").

[17] Defendants take issue with Mahan's pleading to the extent that it uses the word "Defendants" to describe the actions of all three co-defendants.  However, under Fed. R. Civ. P. 11, Mahan can only plead those facts that are within his personal knowledge or upon good faith belief.  He cannot fully particularize, at this early juncture, the exact role of each Defendant in the scheme. For example, it is unknown who initiated the criminal charges in New York.  Even if the use of "Defendants" to describe their concerted action constitutes a pleading deficiency, such deficiency can easily be rectified through document discovery. For purposes of initial pleading, Mahan contends that the Defendants have each been placed on adequate notice that Mahan considers them to have committed the torts of conversion and trespass to chattel and that each Defendant is jointly and severally liable for the actions of their co-defendant.

**POINT V**

**MAHAN HAS PLED SUFFICIENT FACTS
TO STATE A CLAIM FOR CONVERSION AND TRESPASS TO CHATTEL**

Mahan has sufficiently pled facts to support a legally cognizable claim for both conversion *and* trespass to chattel. [FAC, R. 31 at 66, ¶ 269-274].

Defendants argue that because the police seized possession of the Chattel, that no claim for conversion arises. [R. 36 at 17]   However, it was reasonably foreseeable to Defendants when they elected to initiate the "sham" criminal proceedings against Mahan that the police might seize the property.  That was not part of Defendants' plan , as they sought to claim the property for themselves at the moment of Mahan's false imprisonment; but it was nonetheless foreseeable to Defendants that the police could take such action.  Accordingly, it is black letter law that Defendants must be held liable for all the foreseeable consequences proximately caused by their tortious conduct.  Palsgraf v. Long Island Railroad Co., 248 N.Y. 339, 162 N.E. 99 (N.Y. 1928).

**POINT VI**

**DEFENDANTS' "LITIGATION PRIVILEGE" IS DEFEATED BY THE "SHAM"
LITIGATION EXCEPTION TO NOERR-PENNINGTON**

**A.    AS AN AFFIRMATIVE DEFENSE, THE LITIGATION PRIVILEGE IS UNFIT FOR
        JUDICIAL REVIEW ON A PRE-ANSWER MOTION PURSUANT TO RULE 12(B)(6)**

As a threshold matter, regardless of which body of substantive law may control Count V, the litigation privilege is an affirmative defense[18] which must be

---

[18] Even in California, the litigation privilege is an affirmative defense.  Ramalingam v. Thompson, 151 Cal.App.4th 491, 493 (2007).

interposed at the time of filing a defendant's answer. Fed. R. Civ. P. 8(a); accord Fed. R. Civ. P. 8(c) (providing that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense.). This judicial district has adopted the majority view applying the Twombly-Iqbal pleading standard to affirmative defenses. See Aspex Eyewear Inc. v. Clariti Eyewear Inc., 531 F. Supp.2d 620 (S.D.N.Y. 2008).

"Rule 12(b)(6) tests whether the complaint states a claim for relief, and a plaintiff may state a claim even though there is a defense to that claim. The mere presence of a potential affirmative defense does not render the claim for relief invalid. Further, these defenses typically turn on facts not before the court at that stage in the proceedings." Brownmark Films, LLC v. Comedy Partners, et al., 682 F.3d 687, 689 (7th Cir. 2012) (citation omitted).  "The facts necessary to establish an affirmative defense must generally come from matters outside of the complaint. Thus, with some exceptions, affirmative defenses should be raised in responsive pleadings, not in pre-answer motions brought under Rule 12(b)." Worldcom, Inc. v. Graphnet, Inc., 343 F.3d 651, 657 (3d Cir. 2003) (citations omitted).  Accordingly, the affirmative defense interposed by Roc Nation (and its co-defendants) is unripe for review until such time as an answer has been filed.

**B.    FEDERAL LAW'S "SHAM" LITIGATION EXCEPTION TO THE NOERR-PENNINGTON DOCTRINE IS CONTROLLING**

The issue raised by the litigation privilege defense is a federal question addressed within the confines of First Amendment jurisprudence.  Defendants' privilege to gain access to the courts and to initiate criminal proceedings cannot

16

exceed the boundaries of their First Amendment right to petition the government

for redress of grievances.  California Transport v. Trucking Unlimited, 404 U.S. 508,

510 (1972) ("The right to access to the courts is but one aspect of the right to

petition."). [19] Roc Nation's opening brief appears to suggest that civilians,

particularly those represented by counsel, can freely engage in all types of illegal

conduct and criminal malfeasance - with the bad faith intent to cause harm to other

persons or property  -  without ever being held accountable. [R. 36 at 17-18][20]  They

have entirely misrepresented California's litigation privilege. [21]

---

[19] Even California courts have found the privilege to be based on the constitutional right to petition found in both the California and United States constitutions.  City of Long Beach v. Bozek, 31 Cal. 3d 527, 533 (1982).

[20] Mahan refutes Roc Nation's argument that California law is controlling with respect to Mahan's conversion claim [R. 36 at 14-15].  First, the sound recordings were created (i.e., fixed into a tangible form of expression) in New York.  Second, the equipment and portable media used to create the sound recordings were procured by Mahan in New York.  Third, any key witnesses or documents pertaining to the alleged "theft" of the Chattel from New York City-based recording studios are presumptively located in New York.  Fourth, in April 2014, Defendants initiated their "sham" criminal proceeding in New York by filing a criminal complaint with the NYPD (before instigating proceedings with the LAPD).  Fifth, Jay Z, the instigator of the conversion plot, is a resident of New York City.  Sixth, UMG, Roc-A-Fella's parent company, was attempting to requisition the property from its New York offices.  [R. 7-1].

[21] The California Supreme Court has stated that a pre-litigation communication is privileged only if it "relates to litigation that is contemplated in good faith and under serious consideration." Action Apartment Assn., Inc. v. City of Santa Monica 41 Cal.4th 1232, 1251, 63 Cal.Rptr.3d 398, 163 P.3d 89 (2007).  The requirement of "good faith contemplation" and "serious consideration" provides some assurance that the communication has some "connection or logical relation" to a contemplated action and is made "to achieve the objects" of the litigation. Id., 41 Cal.4th at p. 1241; accord RESTATEMENT (SECOND) OF TORTS § 586, cmt. E. The litigation privilege attaches to pre-litigation communications that are made at the point that "imminent access to the courts is seriously proposed by a party in good faith  for the purpose of resolving a dispute." Edwards v. Centex Real Estate Corp., 53 Cal.App.4th at p. 36, 61 Cal.Rptr.2d 518.  "Whether a pre-litigation communication relates to litigation that is contemplated in good faith and under serious consideration is an issue of fact." Feldman v. 1100 Park Lane Associates 160 Cal.App.4th 1467, 1487 (2008).

Here, the pre-litigation statements on which Count V for conversion is based did NOT relate to litigation that was contemplated in good faith and under serious consideration at the time the April 2014 criminal charges were filed.  Rather, Mahan's pleading alleges that Roc Nation, at the direction of Jay Z, and with full knowledge and ratification of Roc-A-Fella, arranged for Mahan to be falsely imprisoned in order to facilitate the conversion of his  property.  [FAC, R. 31,  ¶ 213-214]

However, "just as false statements are not immunized by the First Amendment freedom of speech . . . baseless litigation is not immunized by the First Amendment right to petition."  Bill Johnson's Restaurants v. NLRB 461 U.S. 731, 743 (1983); see also Clipper Exxpress v. Rocky Mountain Motor Tariff, 690 F.2d 1240, 1255 (9th Cir. 1982) (sham litigation is not immunized because "it is not an exercise of first amendment rights.").  It is self-evident that a citizen's privilege to exercise the First Amendment right to petition the government cannot provide immunity where the *intent* of such exercise is to trample the Bill of Rights guaranteed to others.  A civil society demands accountability for such conduct.

Consistent with these principles, the U.S. Supreme Court formulated the *Noerr-Pennington* doctrine to protect the First Amendment rights of citizens who make genuine efforts to petition government's processes for the object for which they are intended.  Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc. 365 U.S. 127, 135 (1961); United Mine Workers v. Pennington, 381 U.S. 657, 670 (1965). [22]

Like California's codified litigation privilege, "the *Noerr-Pennington* doctrine has been extended to preclude virtually all civil liability for a defendant's

---

[22] In a federal forum, the scope of the litigation privilege should be decided under federal law.  See Audi AG & Volkswagon of America, Inc. v. D'Amato, 341 F. Supp. 2d 734, 755 n.4 (E.D. Mich. 2004) (recognizing that "privilege rules are evidentiary and procedural.  Therefore, federal privilege law should determine whether the privilege applies.").  Thus, the Noerr-Pennington doctrine is the correct standard to apply in assessing whether Defendants' tortious activity is immunized from suit. Globetrotter Software, Inc. v. Elan Computer Group, Inc., 362 F.3d 1367 (Fed. Cir. 2004) (the same First Amendment policy reasons that justify the extension of Noerr immunity to pre-litigation conduct in the context of federal antitrust law apply equally in the context of state-law tort claims.").See also A.H.D.C. v. City of Fresno, No. 2000 WL 35810722, (E.D. Cal Aug. 21, 2000) ("various jurisdictions have extended the [*Noerr-Pennington*] doctrine to other areas of law, including state law tort liability.")

petitioning activities before not just courts, but also before administrative and other governmental agencies." People ex rel Gallegos v. Pacific Lumber Co., 158 Cal. App. 4th 950, 964 (2008) (citing California Transport, 404 U.S. at 510-511). However, petitioning activity which amounts to an abuse or misuse of government's processes is a "sham" and therefore not protected.[23] California Transport, 404 U.S. at 516.[24] A single instance of sham litigation may remove Noerr-Pennington immunity. In re Fresh Del Monte Pineapple Antitrust Litig., 2007 U.S. Dist. LEXIS 1372, at *54, n.19 (S.D.N.Y. Jan. 4, 2007).

In Professional Real Estate Investors v. Columbia Pictures Industries, 508 U.S. 49, 56 (1993), the Supreme Court enunciated a two-prong test for determining when petitioning activity constitutes a "sham" undeserving of Noerr-Pennington immunity. A "sham" lawsuit is one that is: (1) so objectively baseless that "no reasonable litigant could realistically expect success on the merits" and (2) "'an attempt to interfere directly'" with a competitor's business relationships through the 'use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.'" In short, the "sham" exception applies

---

[23] See California Transport, 404 U.S. at 516 (finding defendant's numerous and repetitive lawsuits shams because they served no purpose but to interfere with plaintiff's business).

[24] The sham litigation exception applies to matters where there is "improper interference with governmental processes' that amount to illegal reprehensible practices such as perjury, fraud, conspiracy with or bribery of governmental decision makers, or misrepresentation, or is so clearly baseless as to amount to abuse of process." California Transport, 404 U.S. at 512-13.

where the pre-litigation petitioning activity is objectively baseless and carried out in bad faith (or with improper motive).[25]

### C.   AS A MATTER OF LAW, DEFENDANTS' CRIMINAL CHARGES AGAINST MAHAN WERE OBJECTIVELY BASELESS

In <u>Professional Real Estate Investors</u>, the High Court made explicit that the first step in the analysis was to determine whether the alleged sham proceeding was "objectively baseless," that is, whether it had *probable cause.* 508 U.S. at 60-62.

Here, Mahan has pled facts that establish the first prong of PRE's "sham" petitioning test.  Despite the fact that Roc Nation and Jay Z filed three separate felony criminal complaints with three independent law enforcement agencies, none of these government bodies arrested Mahan nor charged him with any crime. [FAC, R. 31, ¶¶ 219-222].   Mahan respectfully requests that the Court take judicial notice that *there was no probable cause* found by these government agencies.  There was insufficient evidence – or NO evidence -  that Mahan committed the crimes of grand larceny, possession of stolen property, or extortion.[26]  Given that the second prong of the "sham" test is a fact-based determination, the absence of any arrest

---

[25] According to the Ninth Circuit, sham litigation occurs where (1) a "lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful" or (2) a "party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy" 552 F. 3d 1033, 1045 (9th Cir. 2009) quoting <u>Sosa v. DIRECTV, Inc.</u>, 437 F. 3d 932, 938 (9th Cir. 2006); <u>see also</u> <u>Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.</u>, 136 Cal. App. 4th 464, 479 ("There is an exception to Noerr–Pennington immunity: it does not apply to sham activities."); <u>Hi-Top Steel Corp. v. Lehrer</u>, 24 Cal. App. 4th 570, 582-83 (1994) (applying the sham litigation exception where a private company made false statements to the city government in order to intentionally interfere with a competitor's business dealings).

[26] Although the Court may ultimately render its own assessment as to whether the charges filed were objectively baseless, the lack of any arrest by police officers makes it plausible, at the very least, that the charges filed by Defendants were objectively baseless.

should be enough, standing alone, to justify denial of Roc-Nation's Rule 12(b)(6) motion.

**(1)   GRAND LARCENY – NYPD**

On or about April 14-17, 2014, Defendants[27] initiated a criminal complaint in this Judicial District, with the NYPD, accusing Mahan of "grand larceny." The factual predicate for this complaint was that Mahan allegedly stole the Chattel from the New York City-based recording studios where the SR Copyrights were created in 1999 and 2000.

However, at the time of filing the criminal complaint for grand larceny in 2014, more than thirteen (13) years had passed since the date that the alleged theft took place.  Under New York law, the criminal statutes of limitations for grand larceny is three (3) to five (5) years.   See N.Y. Crim. Proc. § 30.10(2)(b)-(c).[28] Accordingly, Defendants' criminal complaint with the NYPD was objectively baseless for no other reason than that it was obviously time-barred.

Further, despite ample opportunity to do so, Defendants have failed to come forward with documentary evidence showing that any one of them has a valid

---

[27]  As of today's filing, Mahan does not know which one of the Defendants initiated the criminal complaint with the NYPD.  In any event, Mahan alleges that they acted in concert.  Notably, Mahan was informed that the NYPD complaint preceded the LAPD complaint and may have been leveraged as a basis to initiate the other two criminal complaints in Los Angeles.

[28]  Under New York law, there is also a three-year statute of limitations governing actions based on the recovery of chattel.  See N.Y. CPLR 214[3].  In situations where the allegedly "stolen" object resides in the possession of an accused "thief," the statute of limitations runs from the time of the alleged theft.  See, e.g., Sporn v. M.C.A. Records, Inc., 58 N.Y.2d 482, 487-88 (1983), even if the plaintiff was unaware of the theft at the time that it occurred.  Varga v. Credit- Suisse, 5 A.D.2d 289, 292-93, aff'd, 5 N.Y.2d 865 (1958); Guggenheim Foundation vs. Lubell, 77 N.Y.2d 311, 314 (1991).  Thus, any civil cause of action to recover the chattel must have accrued over thirteen (13) years ago, long past the expiration of the three-year statute of limitations prescribed by N.Y. CPLR 214[3].

ownership interest in the Chattel.  Indeed, they aggressively sought the Court's order to stay discovery in this proceeding; knowing that no such evidence exists.

**(2)**     **POSSESSION OF STOLEN PROPERTY – LAPD (DEVONSHIRE)**

On or about April 18, 2014, Defendants filed a criminal complaint accusing Mahan of being in possession of stolen property.  [FAC, R. 31, ¶ 217].   However, at the time Defendants filed the criminal complaint, more than thirteen (13) years had passed since the date that the alleged theft took place.  Under California law, the criminal statute of limitations for the criminal offense of theft or receiving stolen property is one (1) year (misdemeanor) to three (3) years (felony).  See Cal. Pen. Code § 803.[29] Accordingly, Defendants' criminal complaint with the LAPD (Devonshire) was objectively baseless for no other reason than that it was time-barred.  Further, despite ample opportunity to do so, none of the Defendants have come forward with documentary evidence showing that any one of them has a valid ownership interest in the Chattel that was allegedly stolen.

**(3)**     **EXTORTION – LAPD (BEVERLY HILLS)**

On or about April 18, 2014, Roc Nation or its partner Live Nation, LLC, under the direction of Jay Z, and with full knowledge and ratification by Roc-A-Fella, filed a criminal complaint accusing Mahan of extortion.  The factual predicate for this charge was that Mahan allegedly made a demand for monies under force of threat that, if payment was not received, he would allow a commercial storage

---

[29]  Similarly, a civil cause of action for recovery of chattel would also be time-barred under California's three (3) year statute of limitations, pursuant to Section 338 of the California Civil Code. See Cal Civ. Code § 338

facility to place the Chattel up for public auction.

Despite the scandalous headlines, which have deprived Mahan of his good name and reputation for the remainder of his life, Jay Z and Roc Nation unilaterally withdrew or "dropped" the extortion charges in less than four weeks time, on or about May 14, 2014. [R. 31, ¶¶ 224; Ex. F]. The withdrawal of charges occurred just days after Mahan's counsel notified Reed Smith LLP and UMG, during separate telephone conversations, that Mahan was a copyright owner of the materials embodied in the Chattel.  [Id. at ¶ 223].  As such, Defendants' withdrawal of the extortion charge constitutes an extrajudicial admission that the pre-litigation petitioning activity was objectively baseless.

### D.  DEFENDANTS INSTIGATED THE CRIMINAL CHARGES AGAINST MAHAN IN BAD FAITH AND WITH IMPROPER MOTIVE

The second prong of the "sham" test involves the tortfeasor's "subjective motivation" for initiating the petitioning activity.  Professional Real Estate, 508 U.S. at 61-62.  "Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor,' . . . through the 'use [of] the governmental *process* - as opposed to the *outcome* of that process - as an anticompetitive weapon."  Id.  "We regard as sham 'private action that is not genuinely aimed at procuring favorable government action,' as opposed to 'a valid effort to influence government action.'  Id.  (citation omitted). Improper motivation may also be shown where the tortfeasor "is indifferent to the outcome of the litigation itself, but has nevertheless sought to impose a collateral harm on the

[accused party] by, for example, impairing his credit, abusing the discovery process, or interfering with his access to the governmental agencies." <u>Professional Real Estate</u>, 508 U.S. at 67 (Stevens, J., concurring).[30]

Here, the First Amended Complaint alleges facts to support the reasonable inference that Defendants initiated "sham" criminal proceedings to directly interfere with Mahan's valuable property through misuse of the criminal justice system, even though Defendants (and their sophisticated counsel) knew that the ownership dispute was a civil matter.  [FAC, R. 31, ¶¶ 213-220].  As outlined in the complaint, <u>Id</u>., the false charge of felony extortion is particularly revealing of Defendants' malicious intent to use the governmental process as a weapon, rather than as a genuine effort to procure favorable governmental action.[31]

<u>First</u>, bad faith is shown by the mere fact that Defendants have failed to produce any documentation that they even own the property in question.  Indeed, there have been at least three reported buy/sell transactions over the last fourteen years in which sophisticated law firms would have conducted an in-depth inventory of company assets (tangible and intangible) as part of a merger or

---

[30] <u>See also</u> <u>California Transport</u>, 408 U.S. at 511-12 ("misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process" particularly where made "with or without probable cause, and regardless of [the] merits."); <u>Allied Tube & Conduit Corp. v. Indian Head</u>, 486 U.S. 492 (1988) (noting "unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations."); <u>Kottle</u>, 146 F. 3d at 1060 (bad faith communications "consist[] of making intentional misrepresentations to the court" or may be shown where the "party's knowing fraud upon . . . the court deprive the litigation of its legitimacy.")

[31] According to NY Penal Law §155.05(2): "A person obtains property by Extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will . . . (ii) Cause damage to property…"   Applied here, Mahan could only be prosecuted for extortion if he demanded that money be delivered to him under the imminent threat that Defendants' failure to deliver the money would result in damage to property belonging to Defendants.

acquisition of Roc-A-Fella or Def Jam.  Yet, there was never any reports of property missing from the asset schedules.[32]

      <u>Second</u>, the chronology of events clearly shows that Mahan had absolutely no leverage to "instill fear" in Defendants and their sophisticated counsel, a partner at Reed Smith LLP, who casually spent two days conducting due diligence of Mahan's property, in plain view, at a commercial storage facility open to the public. As of April 17, 2014, Defendants knew the exact address, location, and identity of the commercial storage facility, as well as Mahan's unit numbers within the facility where the Chattel was kept.  [FAC, R. 31, ¶¶ 213-220].   This fact destroys the element of "fear" or threat of force necessary to accuse Mahan of criminal coercion. As soon as Defendants knew of the location of the property, they could have filed an action against the storage facility (and Mahan) to freeze the property pending resolution of their ownership claim.[33]

## CONCLUSION

Based on the foregoing, Plaintiff Chauncey respectfully requests that the Rule 12 motion be denied in its entirety**.  ……**    **/jameshfreeman/**

---

[32] This could only mean that Defendants could not have harbored a good faith belief that the property kept in Mahan's custody, control and possession for the last 14 years actually belonged to one of the Defendants.

[33] In <u>Professional Real Estate</u>, Justice Stevens explained that "litigation filed or pursued for such collateral purposes [of harming a competitor] is fundamentally different from a case in which the relief sought in the litigation itself would give the plaintiff a competitive advantage." *Professional Real Estate*, 508 U.S. at 67 (Stevens, J., concurring). Here, Mahan respectfully submits that a critical distinction should be drawn between (1) the act of using government processes (i.e., police officers) to falsely imprison another civilian as a means to steal the victim's property; and (2) the act of using government processes (i.e., judicial officers) to obtain a court order that will transfer legal title of the subject property to the petitioner.  Mahan submits that the former scenario, as set forth in the First Amended Complaint, constitutes an actionable claim for sham petitioning that defeats the litigation privilege – in any state.